**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| DAVID RAMIREZ and CANDICE MCINTYRE, Individually and on Behalf of All Others Similarly Situated,<br><br>          Plaintiffs,<br><br>v.<br><br>TD BANK, N.A. AND AIRLINES REPORTING CORPORATION,<br><br>          Defendants. | Case No.:<br><br>JURY TRIAL DEMANDED<br><br>**CLASS ACTION COMPLAINT** |

**TABLE OF CONTENTS**

I.      NATURE OF CASE ........................................................................................ 1

II.     PARTIES ....................................................................................................... 5

        A.      Plaintiffs ........................................................................................... 5

        B.      TD Bank, N.A. .................................................................................. 6

        C.      Airlines Reporting Corporation ....................................................... 7

III.    JURISDICTION AND VENUE ................................................................... 9

IV.     FACTUAL ALLEGATIONS ........................................................................11

        A.      TIP and the Systematic Disclosure of Personal and Financial Data ......................11

        B.      The Right to Financial Privacy Act.................................................. 13

        C.      Privacy Rights and Injury-in-Fact................................................... 17

        D.      TD Bank as a Financial Institution and Its Obligations Under the RFPA ............ 19

        E.      Alternatively, ARC is not Merely an Agent, But Is Also a Financial
                Institution in Its Own Right ............................................................. 27

        F.      ARC as Agent of TD Bank and TD Bank's Vicarious Liability ........................... 28

        G.      Violations of RFPA's Core Requirements ........................................ 28

        H.      TD Bank's Knowledge and Responsibility....................................... 31

        I.      Willful and Intentional Violations................................................... 33

        J.      ARC Converted Property and Was Unjustly Enriched Through the Sale of
                Plaintiffs' and Class Members' Personal and Financial Data ............................ 35

V.      CLASS ACTION ALLEGATIONS ............................................................. 37

COUNT I – VIOLATION OF THE RIGHT TO FINANCIAL PRIVACY ACT (*Against TD
        Bank on behalf of Plaintiffs and the RFPA Class*) .............................................. 40

COUNT II - VIOLATION OF THE RIGHT TO FINANCIAL PRIVACY ACT (*Against
        ARC on behalf of Plaintiffs and the RFPA Class*)............................................... 41

PRAYER FOR RELIEF ........................................................................................... 43

DEMAND FOR JURY TRIAL................................................................................. 44

Plaintiffs, David Ramirez and Candice McIntyre ("Plaintiffs" or "Users"), on behalf of themselves and all others similarly situated, bring this action against TD Bank, N.A. ("TD Bank," "Defendant" or the "bank") and Airlines Reporting Corporation ("ARC") (collectively "Defendants") for their violations of federal and state laws. Allegations made in this Complaint are made pursuant to the investigation of Plaintiffs' counsel and based upon information and belief, except as to allegations specifically pertaining to themselves and their counsel, which are based on personal knowledge.

## I.    NATURE OF CASE

1.    This lawsuit is necessitated by an unprecedented betrayal of TD Bank, N.A. and Airlines Reporting Corporation in connection with the sale of personal and financial data entrusted to them when processing payment for consumer travel to federal government agencies without notice to consumers.

2.    TD Bank, N.A. ("TD Bank" or the "bank") is one of the ten largest banks in the United States. The Airlines Reporting Corporation ("ARC") is a privately-owned FinTech and clearinghouse co-owned by nine of the nation's largest airlines. Together, Defendants have operated a secret pipeline for years[1] that delivers, for profit, detailed personal and financial information—including over three years' worth of passengers' full names, addresses, complete credit-card numbers, travel itineraries, and payment amounts—directly to multiple federal agencies.

3.    The sale of data occurs in bulk, without warrants, without subpoenas, without notice to the individual, and without the individual's knowledge or consent. The mechanism is ARC's Travel Intelligence Program ("TIP"), a commercial data product that gives agencies ranging from

---

[1] According to records maintained by USAspending.gov, ARC entered into its first contract with a government agency in 2008, with 286 additional transactions in subsequent years.

ICE and CBP to the IRS, Secret Service, ATF, and DOD "unrestricted access" to search more than one billion travel records by name or credit-card number alone.

4.      In short, when Americans purchase an airline ticket and that transaction is processed through TD Bank and ARC, Defendants treat that transaction as an open invitation to monetize the data by selling access to the COMPASS ARC database to governmental entities. To give context as to scope, TD Bank and ARC work together to process transactions for 241 airlines and 10,047 travel agencies, including online platforms like Expedia. For the single month of November 2025 alone the total sales processed were an estimated $7,146,979,608.

5.      TD Bank has served as ARC's exclusive settlement bank since July 2021. In this role, TD Bank owns and controls the banking infrastructure that generates, processes, and maintains highly sensitive personal and financial records. ARC, acting as TD Bank's agent and third-party service provider, operates the day-to-day payment system under TD Bank's federal charter. Federal banking regulators—the OCC, Federal Reserve, and FDIC—have made it unambiguously clear, repeatedly and most recently in the 2023 Interagency Guidance on Third-Party Relationships (the "Interagency Guidance"), that under applicable rules and regulations a bank remains fully responsible for its service provider's compliance with federal law "to the same extent as if [the] activities were performed by the banking organization in-house."

6.      That includes the Right to Financial Privacy Act (RFPA), 12 U.S.C. § 3401 *et seq.*, the 1978 statute enacted by Congress to prevent financial institutions from voluntarily providing personal financial records to the government without individualized legal process and individualized notice. Yet TD Bank knew (or deliberately avoided knowing) that ARC was using the bank's charter to run a lucrative side business selling bulk access to the very same records it had access to by virtue of TD Bank's charter.

7. ARC itself is not a neutral middleman. Processing nearly $100 billion in transactions annually and holding what it boasts as "the world's largest, most comprehensive repository of global airline tickets," this Fintech occupies a monopolistic position in U.S. travel-agency ticketing settlement. Owned by Delta Air Lines, Inc., United Airlines, Inc., American Airlines, Inc., Southwest Airlines Co., Alaska Airlines, Inc., JetBlue Airways Corporation, Air Canada, Deutsche Lufthansa Aktiengesellschaft (or Deutsche Lufthansa AG), and Société Air France, S.A. (Air France), ARC functions as (among other things) a bank and specialized intermediary, processor and financial clearinghouse that cannot perform its core settlement and payment activities without a bank charter—a charter it borrows from TD Bank. Through the TIP, launched in the wake of 9/11 and dramatically expanded in recent years, ARC has turned consumer personal, travel and financial information into a revenue stream, freely selling access to its ARC COMPASS database.

8. With respect to the sale to government agencies, this provides the government with the ability to run warrantless and unlawful searches on Americans' movements and payment methods. Procurement records confirm that analysts can pull records simply by typing in a name or credit-card number – no court order, no lawful subpoena, and no notice to or consent from the individual ever – for billions of transactions for a vast thirty-nine-month period.

9. This arrangement runs afoul of every core protection of the RFPA. Congress enacted the RFPA after finding that financial institutions had become *de facto* agents of law enforcement by routinely turning over personal records without legal process. The RFPA flatly prohibits financial institutions (*or their agents*) from releasing an individual's financial records to the government unless the individual is given notice and an opportunity to object, and unless the government first obtains one of the statute's enumerated forms of individualized legal process.

10.     Plaintiffs, like millions of other Americans, purchased airline tickets through a travel agency whose payments flowed through ARC's TD Bank-powered settlement system. Without Plaintiffs' knowledge or consent, Plaintiffs' full credit-card number, name, itinerary, and transaction details were ingested into ARC's databases and made available for unrestricted government searching through the TIP. No notice was ever sent to Plaintiffs. No opportunity to challenge the disclosure was ever afforded. No certification of RFPA compliance was ever obtained. Plaintiffs were not even made aware that Defendants would have access to their personal and financial information. Plaintiffs' statutory right to financial privacy—a right Congress deemed fundamental—was simply erased for the convenience and profit of a bank and an airline-owned data broker that was using TD Bank's charter.

11.     What makes these violations particularly stunning is that they were entirely avoidable. TD Bank is required under applicable rules and regulations—and was on express regulatory notice that it was required—to assess and monitor whether its third-party providers were improperly disclosing information. It was required to insert contractual prohibitions on such disclosures and to audit compliance. It did none of those things, or did them so inadequately, negligently, willfully and with deliberate indifference to the rights of individuals that ARC was free to operate its surveillance marketplace for years. The result is a privacy invasion on an almost incomprehensible scale: billions of records, touching more than half of global air travel, opened to federal agencies for fishing expeditions limited only by an analyst's imagination.

12.     This action is being brought on behalf of every natural person whose travel purchases were processed through TD Bank and ARC's system and exposed to federal agencies via the TIP without the safeguards the RFPA demands. The violations described in this Complaint are systematic, willful, and ongoing. The injury to millions of Americans' statutory and

4

constitutional privacy interests is profound. And the need for judicial intervention—to halt the disclosures, to hold both the bank and its agent accountable, and to vindicate the privacy rights Congress promised—could not be more urgent.

## II.     PARTIES

### A.     Plaintiffs

13.     Plaintiff David Ramirez ("Plaintiff" or "Ramirez") is a natural person and a resident of the State of California.

14.     During all times relevant to this complaint, Ramirez used a payment method that was routed through ARC and processed through TD Bank's payment settlement system when purchasing an airline ticket, and whose financial records were thereby generated, maintained, and controlled by TD Bank and ARC.

15.     Ramirez's airline ticket purchase was made on June 20, 2025 through Expedia, using a credit card held in Ramirez's name.

16.     Airline ticket purchases through Expedia, like Ramirez's, are processed through TD Bank and ARC's settlement system.

17.     Plaintiff Candice McIntyre ("Plaintiff" or "McIntyre") is a natural person and a resident of the State of Illinois.

18.     During all times relevant to this complaint, McIntyre used a payment method that was routed through ARC and processed through TD Bank's payment settlement system when purchasing an airline ticket, and whose financial records were thereby generated, maintained, and controlled by TD Bank and ARC.

19.     McIntyre's airline ticket purchase was made on September 30, 2023 through Expedia, using a credit card held in McIntyre's name.

5

20. Airline ticket purchases through Expedia, like McIntyre's, are processed through TD Bank and ARC's settlement system.

21. Plaintiffs' financial records relating to airline ticket purchases—including payment card information, transaction amounts, dates of purchase, travel itineraries, passenger information, and credit card numbers—were contained in the ARC COMPASS database and disclosed by Defendants to federal government agencies without proper legal process and to other third parties, without notice to Plaintiffs, and without Plaintiffs' consent, in blatant violation of the RFPA. ARC also converted Plaintiffs' property and was unjustly enriched from the sale of data to the government and third parties.

22. Upon information and belief, Plaintiffs' financial and personal travel records were made available to federal agencies and third parties through ARC's TIP, enabling government officials and others to conduct unrestricted searches by name or credit card number to access Plaintiffs' travel and payment information without Plaintiffs' knowledge.

23. Each Plaintiff is a "customer" within the meaning of 12 U.S.C. § 3401(5), and the records disclosed by Defendants – names, addresses, and account numbers – constitute "financial records" within the meaning of 12 U.S.C. § 3401(2), or information derived from a financial record.

**B.     TD Bank, N.A.**

24. TD Bank, N.A. is a federally chartered financial institution subject to regulation by the Office of the Comptroller of the Currency. As a federal charter holder, TD bank is not incorporated in any particular state, though it maintains a corporate headquarters location in Wilmington, DE, with an additional headquarters location in Mount Laurel, NJ.

25. TD Bank is one of the ten largest banks in the United States, with over $380 billion in assets and operations spanning multiple states.

26.     TD Bank maintains and controls financial records of its customers, including records generated through payment processing systems it operates directly and through agents.

27.     Since July 2021, TD Bank has served as ARC's settlement processing bank.

28.     TD Bank owns and maintains the banking infrastructure and charter through which ARC's payment settlement operations are conducted.

29.     As a financial institution within the meaning of 12 U.S.C. § 3401(1), TD Bank is subject to the requirements and prohibitions of the RFPA.

30.     TD Bank has actual and/or constructive knowledge of ARC's arrangements with federal agencies for bulk disclosure of financial records, yet failed to prevent, halt, or remedy these systematic violations of the RFPA.

31.     Under the RFPA and the Interagency Guidance, TD Bank is responsible for ensuring that ARC's activities comply with all applicable laws and regulations, including the RFPA.

### C.     Airlines Reporting Corporation

32.     ARC is a privately held, not-for-profit corporation incorporated in Delaware with its principal place of business in Arlington, Virginia. ARC maintains additional offices in Louisville, Kentucky, and Tampa, Florida.

33.     ARC was established in 1984 following dissolution of the Air Traffic Conference of America pursuant to a Civil Aeronautics Board order. ARC operates under a unique ownership structure, being jointly owned by nine major airlines: Delta Air Lines, Inc., United Airlines, Inc., American Airlines, Inc., Southwest Airlines Co., Alaska Airlines, Inc., JetBlue Airways Corporation, Air Canada, Deutsche Lufthansa Aktiengesellschaft (or Deutsche Lufthansa AG), and Société Air France, S.A. (Air France). ARC is governed by a board of directors that includes

7

representatives from both the airline and travel agency industries, with board members drawn from each of the owner airlines.

34. ARC's operational scale reveals its scope and reach. In 2024, ARC processed over $99 billion in transaction volume. ARC serves more than 240 airlines worldwide and compiles data on more than 270 carriers, sourced from approximately 12,800 accredited travel agencies. ARC employs approximately 3,200 employees and operates across six continents. ARC's historical data repository contains over 15 billion passenger flights representing 490 airlines and 230 countries and territories, covering approximately 54 percent of all flights taken globally. ARC describes itself as maintaining "the world's most comprehensive repository of global airline tickets."

35. ARC is a Fintech provider and provides a multitude of financial services. ARC functions as a bank using TD Bank's charter and as a specialized financial clearinghouse and settlement platform that supports the travel industry by providing transaction settlement between travel suppliers and resellers.

36. ARC operates in a unique market position where it has no competitor for its core settlement function, effectively holding a monopoly on processing airline bookings through travel agencies in the United States, Puerto Rico, the U.S. Virgin Islands, and American Samoa.

37. ARC sends credit card transactions to airlines' credit card providers and wire payments daily to airlines' bank accounts for cash transactions, commissions and memos. ARC also processes transactions on behalf of airlines, including sales, exchanges, refunds, electronic miscellaneous documents, memos and agency adjustments. ARC streamlines money transfers, revenue accounting information and business tools for the airline industry.

38.     ARC maintains detailed records of airline ticket purchases, including passenger names, payment card information, credit card numbers, travel itineraries, fare details, and transaction details.

39.     ARC acts as agent of TD Bank in operating the payment settlement system and maintaining financial records of transactions processed through that system.

40.     ARC qualifies as a "financial institution" within the meaning of 12 U.S.C. § 3401(1) by virtue of its role as a consumer finance institution, payment processor, card issuer agent, and entity engaged in financial and banking activities.

41.     ARC also acts as a data broker and operates the TIP.

42.     Under TIP, ARC sells ticket settlement data and consumer financial information to various U.S. government agencies including ICE, the Department of Homeland Security, the Bureau of Alcohol, Tobacco, Firearms & Explosives, the Department of Defense, the Internal Revenue Service, the U.S. Secret Service, the Securities and Exchange Commission, the State Department, the U.S. Marshals Service, the Transportation Security Administration, and the U.S. Department of the Treasury.

43.     The TIP database holds an estimated one billion or more records spanning 39 months of past and future travel data, with government analysts gaining what ARC describes as "unrestricted access" to all sold ticket databases. This access enables targeted searches by passenger name or credit card number.

## III.    JURISDICTION AND VENUE

44.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under federal law, specifically the RFPA of 1978, 12 U.S.C. § 3401 *et seq*.

45.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because: (a) this is a class action involving more than 100 Class Members; (b) the amount in controversy exceeds $5,000,000 exclusive of interest and costs; and (c) minimal diversity exists between Plaintiffs and Defendants.

46.    This Court has personal jurisdiction over Defendants.

47.    TD Bank is subject to general jurisdiction in Delaware because it was organized under the laws of the State of Delaware. Accordingly, TD Bank is "at home" in Delaware, and this Court may exercise personal jurisdiction over it. Furthermore, TD Bank maintains continuous and systematic contacts with Delaware that render it essentially at home in this forum. TD Bank operates numerous branch locations throughout Delaware, solicits and provides services in Delaware, maintains deposits and extends credit to residents of Delaware, and conducts extensive banking operations on a continuous basis within Delaware such that it is "at home" in Delaware for the purposes of exercising personal jurisdiction over it.

48.    This Court has personal jurisdiction over ARC because it is a corporation organized under the laws of the State of Delaware. Accordingly, ARC is "at home" in Delaware, and this Court may exercise general personal jurisdiction over it.

49.    Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(3). A civil action may be brought in any judicial district in which any defendant resides, provided all defendants are residents of the state in which the district is located. For venue purposes, a corporation resides in any judicial district in which it is subject to personal jurisdiction at the time the action is commenced. 28 U.S.C. § 1391(c)(2). Because both Defendants are subject to personal jurisdiction and incorporated in Delaware, Defendants reside in this District, and venue is proper under §1391(b)(1) or (b)(3).

IV.    **FACTUAL ALLEGATIONS**

A.    **TIP and the Systematic Disclosure of Personal and Financial Data**

50.    ARC also operates as a data broker and in this capacity created what it calls the TIP.

51.    Under the TIP program, ARC sells unfiltered ticket settlement data and consumer financial information to various U.S. government agencies.

52.    ARC does not filter or otherwise distinguish the data that it provides to U.S. government agencies.

53.    The extent of the information provided to the government was revealed in June 2025 following the public release of a U.S. Immigration and Customs Enforcement procurement proposal for a data contract with ARC and resulting media reports that exposed the sale of billions of flight records containing consumer personally identifiable information and financial information to multiple government agencies.

54.    The media reports, justifiably so, raised significant privacy concerns among consumer advocates and lawmakers. Critics noted that the data is collected and sold without traveler knowledge or consent, and the aggregated nature of the database provides law enforcement with surveillance capabilities not available through other means.

55.    Even more telling were the details in the ICE proposal about the scope and breadth of information provided.

56.    In the proposal, ICE notified the Office of Acquisition Management that it intended to purchase a software license for TIP. The proposal described three different TIP Services—"TIP Online, TIP Monitoring, and TIP Search." ICE explained that the databases "allow[] authorized law enforcement and national security personnel to search ARC's air ticketing database to track

11

and analyze travel patterns of persons of interest," as "[u]sers can conduct searches using key identifiers such as passenger name, itinerary, fare details, *and payment methods*."

57.    The scope of government access to this data through TIP is unprecedented. The databases provide access to "over one billion records, spanning 39 months of past and future travel data—an unparalleled intelligence resource." Some reporting suggests that the number of records is nearly five billion.

58.    Specifically, through real-time access to the databases, government agencies are afforded "unique access to 'ticket face' information, including full flight itineraries, passenger name records, *and financial details*, which are otherwise difficult or impossible to obtain." Through these databases, ICE gains "unrestricted access to all sold ticket databases, *enabling targeted searches by name or credit card number*."

59.    Federal spending records and procurement documents reveal that the following government agencies have contracted for access to the TIP databases: ICE, the Department of Defense, the Department of the Treasury, the Secret Service, the Securities and Exchange Commission, the State Department, the U.S. Marshals Service, the Transportation Security Administration, the Bureau of Alcohol, Tobacco, Firearms and Explosives, and the Internal Revenue Service, among others.

60.    The contract with ICE began in June 2024 and can be extended through 2029, with ARC requesting that government agencies not publicly identify the corporation as the source of the data unless compelled by court order or subpoena. This contractual demand for secrecy reveals Defendants' awareness of the problematic nature of their data-sharing arrangements.

61.    The information provided encompasses "airline transactional information in the ARC COMPASS database, which contains data from the previous thirty-nine months . . . [and]

12

provides HSI the ability to request a search of a traveler/target with ***unique name and/or unique credit card number*** and may include the following: the date that the airline ticket was issued, ticket number, passenger name, passenger record number, ticket segment number, date of departure, time of departure, name of lifting carrier, flight number, origination airport, destination airport, name of the planting carrier, ***form of payment***, ARC travel agency number, and/or an indication of a 'voided' ticket."

62.    This unique position exists precisely because the RFPA prohibits other financial institutions from providing consumer information to the government absent proper legal process.

63.    Privacy advocates have characterized the arrangement as warrantless surveillance conducted without judicial oversight.

**B.    The Right to Financial Privacy Act**

64.    Congress enacted the RFPA in 1978 after it determined that individuals' financial records required statutory protection from government access.

65.    The legislative history of the RFPA reveals Congress' concern about the potential for government abuse. As the House Report accompanying the RFPA explained, the legislation was necessary because "both the confidentiality of financial records and the constitutional rights of citizens would be severely threatened" without statutory protection. The legislative history also makes clear that Congress intended the RFPA to prevent exactly the kind of systematic surveillance arrangement allowed by Defendants' sale of consumer personal and financial information. Congress was concerned that without statutory protection, Americans' financial records would be subject to warrantless government scrutiny. The RFPA was designed to ensure that government access to financial records would be subject to meaningful procedural safeguards, including notice to the affected individual and an opportunity for judicial review.

66.    Congress found that "financial institutions have, in the past, disclosed financial information to Federal enforcement agencies without notification to or permission of the customer," and that such actions "threaten the privacy of individuals and their families."

67.    The RFPA establishes comprehensive procedural safeguards that federal government agencies must follow when seeking access to the financial records of individuals who utilized or were utilizing any service of a financial institution.

68.    Under 12 U.S.C. § 3403(a), the RFPA prohibits "financial institutions . . . or agents of a financial institution" from providing a government agency with access to any individuals' financial records unless the individual is first given notice and the opportunity to object.

69.    A government authority may obtain financial records only through specific legal mechanisms: an administrative subpoena or summons authorized by law and meeting certain requirements; a search warrant; a judicial subpoena; or a formal written request with an individual's authorization.

70.    Each of these mechanisms requires individualized legal process directed at specific individuals whose records are sought.

71.    The statute does not permit bulk access to financial records or ongoing database access for general investigative or surveillance purposes.

72.    Central to the RFPA's protections is the requirement of notice and certification.

73.    Under 12 U.S.C. §§ 3402 and 3405, when a government authority seeks financial records using an administrative subpoena or summons, the customer must receive notice and have the right to challenge the request in court before the records are disclosed.

74.    The government agency must serve the customer with a copy of its request or order, or mail a copy to the customer on or before the date on which it serves the order or delivers or

14

mails the request to the financial institution maintaining the records. The customer then has 10 days from the date of service, or 14 days from the date of mailing, to challenge the requested disclosure.

75. Under the RFPA, neither a financial institution nor its agent may disclose customer financial records unless the government authority seeking such records certifies in writing to the financial institution that it has complied with the applicable provisions of the RFPA.

76. This certification requirement ensures that financial institutions do not become unwitting accomplices to privacy violations. The notice requirement also ensures that customers have an opportunity to assert their rights and challenge government access to their private financial information before disclosure occurs.

77. The RFPA defines "financial institution" as "any office of a bank, savings bank, card issuer as defined in section 1602(n) of Title 15, industrial loan company, trust company, savings association, building and loan, or homestead association (including cooperative banks), credit union, or consumer finance institution . . . ." 12 U.S.C. § 3401(1).

78. The RFPA defines "customer" under 12 U.S.C. § 3401(5) to mean "any person or authorized representative of that person who utilized or is utilizing any service of a financial institution, or for whom a financial institution is acting or has acted as a fiduciary, in relation to an account maintained in the person's name."

79. The RFPA protects individuals, like Plaintiffs, and partnerships of five or fewer individuals.

80. The RFPA defines "financial record" under 12 U.S.C. § 3401(2) as "an original of, a copy of, or information known to have been derived from, any record held by a financial institution pertaining to a customer's relationship with the financial institution." This definition is

15

intentionally broad and encompasses transaction records, payment information, account statements, and other information maintained by financial institutions about their customers' financial activities.

81.    The RFPA provides a private right of action for customers, like Plaintiffs, whose financial records are disclosed to a governmental agency by a financial institution or its agent in violation of the statute.

82.    Under 12 U.S.C. § 3417, a customer may bring a civil action against a financial institution or government authority that violates the Act for actual damages plus attorney's fees and costs, and statutory damages of $100 per violation where no economic damages are shown. The statute also authorizes punitive damages where violations are willful or intentional. These remedies serve both to compensate injured customers and to deter financial institutions from disregarding their statutory obligations.

83.    Congress included these robust remedies because it recognized both the intangible harms recognized at common law and that only meaningful civil liability would ensure compliance with the RFPA's protections.

84.    Plaintiffs and Class Members had a legitimate expectation of privacy with respect to the handling of their financial and travel records. Defendants violated Plaintiffs' and Class Members' rights, and Plaintiffs and Class Members suffered harm as a result of Defendants' conduct, including but not limited to having their detailed financial and travel records unlawfully appropriated and used for a corporation's profit, as well as having their right to seclusion, solitude and privacy intruded upon by having their private, protected financial and travel information sold to government agencies to conduct warrantless searches without process, knowledge or consent.

16

C.    **Privacy Rights and Injury-in-Fact**

85.    In addition to the RFPA, Plaintiffs and Class Members have also suffered injuries-in-fact and their privacy and property rights have been violated.

86.    By virtue of the RFPA and other applicable laws, Plaintiffs and Class Members have: (a) a property interest in their personal, financial and travel information, (b) a reasonable expectation of privacy and (c) have suffered an injury-in-fact as a result of Defendants' conduct.

87.    "Location records hold for many Americans the privacies of life." *Carpenter v. United States*, 585 U.S. 296, 311 (2018) (citation modified).

88.    The COMPASS ARC database that Defendants made available to government agencies includes billions of travel records for a 39-month period that provide an "intimate window into a person's life, revealing not only his particular movements, but through them his 'familial, political, professional, religious, and sexual associations.'" *Carpenter*, 585 U.S. at 311 (citation omitted).

89.    By providing personal, financial and detailed flight information for a period of over three years, government agencies have been able to deduce a detailed log of Plaintiffs' and Class Members' movements in combination with other information available to them.

90.    By disclosing travel data for a 39-month time period, combined with personal (and in the case of government entities, financial information), Defendants have infringed on the privacy of Plaintiffs and Class Members and have caused injury in fact.

91.    Plaintiffs and Class Members had and continue to have a reasonable expectation of privacy in their physical movements.

92.    Plaintiffs and Class Members also had and continue to have a reasonable and legitimate expectation of privacy in their financial information.

17

93. Further, Plaintiffs and Class Members own and possess a cognizable property interest in their personally-identifiable, travel records and financial information, including their name, address, and complete credit card data.

94. "One of the main rights attaching to property is the right to exclude others." *People v. Stewart*, 113 Cal. App. 4th 242, 250 (2003) (quoting 2 William Blackstone, *Commentaries* 2 (1766) ("There is nothing which so generally strikes the imagination, and engages the affections of mankind, as the right of property; or that sole and despotic dominion which one man claims and exercises over the external things of the world, in total exclusion of the right of any other individual in the universe.") (cited with approval in *In re Meta Pixel Tax Filing Cases*, 724 F. Supp. 3d 987, 1024-25 (N.D. Ca. 2024)).

95. In retaining, using and selling full access to their personal and financial data, Defendants unlawfully appropriated Plaintiffs and Class Members' personal, protected information, and Plaintiffs and Class Members were deprived of the right to exclude government agencies from their private property.

96. The appropriation, sale and use of Plaintiffs' and Class Members' personal and financial data has affected Plaintiffs in a personal and individual way, and it has diminished the value of the data to Plaintiffs and Class Members and caused damage to Plaintiffs and Class Members.

97. Courts recognize that confidential personal data is property when, as here, it has independently ascertainable economic value and is treated as a commodity in an established market.

98. Plaintiffs and Class Members have suffered a concrete injury-in-fact as a result of Defendants' conduct. There has been a definitive disclosure of private, protected information to

18

government agencies in violation of a federal statute. Plaintiffs' and Class Members' financial records and personal information were not only accessed, the records were sold in bulk to government agencies in circumstances that require warrants, notice and/or consent, none of which occurred here. Defendants' disclosures were not passive failures, as might be the case in a data breach; this was profit-motivated commercial sale of protected data. The ICE proposal, discussed in detail below, confirms that the financial records were actively used and considered in warrantless searches, and Plaintiffs and Class Members have suffered injuries recognizable at common law.

99.     TD Bank and ARC's exercise of dominion was inconsistent with, and in outright denial of, Plaintiffs' and Class Members' rights of ownership and exclusive possession, causing damage and injury-in-fact.

100.    As such, Plaintiffs and Class Members have suffered cognizable, concrete injuries-in-fact that provide them with standing to pursue RFPA and other claims as a result of the harm caused by Defendants.

**D.      TD Bank as a Financial Institution and Its Obligations Under the RFPA**

101.    As a federally chartered national bank, TD Bank is subject to comprehensive regulation by the Office of the Comptroller of the Currency and must comply with all applicable federal banking laws, including the RFPA.

102.    TD Bank offers a full range of financial services including deposit accounts, credit cards, payment processing, and specialized payment systems for various industries.

103.    Among TD Bank's specialized payment operations is its role as settlement processing bank for airline ticket sales through ARC.

104.    Since July 2021, TD Bank has partnered with ARC as its settlement processing bank.

105. TD Bank maintains and controls the financial infrastructure through which billions of dollars in airline ticket transactions are processed annually.

106. These systems generate and maintain detailed financial records of customer transactions, including payment card information, transaction amounts, dates of purchase, and associated travel information.

107. As the financial institution controlling these records, TD Bank bears responsibility under the RFPA for protecting customer financial information from unauthorized disclosure to government agencies.

108. TD Bank operates its airline payment settlement system through ARC, which serves as the bank's agent in processing transactions and maintaining records.

109. The relationship between TD Bank and ARC is not merely contractual or at arm's length; rather, ARC functions as an extension of TD Bank's payment processing operations, performing essential banking functions under TD Bank's charter, authority and oversight. ARC would not be able to perform these functions without the benefit of TD Bank's charter.

110. TD Bank selected ARC to operate this specialized payment system, exercises control over the system's operation through its third-party risk management program, and benefits financially from the revenue generated by processing airline ticket transactions.

111. In the relationship between TD Bank and ARC, TD Bank (among other things) serves as an "acquiring bank" under the OCC's Comptroller's Handbook on Merchant Processing.

112. An acquiring bank is defined in the manual as a bank that contracts with merchants (or, in facilitated models, with entities like payment facilitators) for the settlement of payment card transactions, providing backroom operations and owning the BIN/ICA for settlement. TD Bank

20

handles ACH debits and credits for settlements, including those related to card transactions processed through ARC's systems.

113. Through TD Bank's relationship with ARC, ARC is also able to operate as a payment facilitator under MasterCard rules or payment service provider under Visa rules.

114. In the Comptroller's Handbook, these are special third-party organizations that contract with an acquirer (like TD Bank) to facilitate transactions on behalf of sub-merchants (in this case, for example, travel agencies).

115. Upon information and belief, ARC acts as the merchant of record for transactions processed via ARC Pay, accessing payment networks on behalf of agencies, receiving funds from card issuers or acquiring banks, and disbursing net amounts to agencies after fees and reserves.

116. This aggregator model aligns with the payment facilitator/PSP description, where the acquirer remains responsible for the actions of the facilitator and sub-merchants.

117. Under federal banking law and general principles of agency, a financial institution cannot avoid its statutory obligations by delegating functions to agents or third-party service providers.

118. The Office of the Comptroller of the Currency (OCC) has repeatedly and consistently informed TD Bank that national banks remain responsible for the actions of their agents and third-party service providers, particularly where those agents perform core banking functions such as payment processing and maintenance of customer financial records.

119. The Federal Deposit Insurance Corporation (FDIC) and Board of Governors of the Federal Reserve System (the "Federal Reserve") have similarly informed TD Bank of its responsibilities when a third party is operating under the bank's charter.

21

120. The Interagency Guidance, issued jointly by the Federal Reserve, the FDIC, and the OCC, makes clear that "whether activities are performed internally or via a third party, banking organizations are required to operate in a safe and sound manner and in compliance with applicable laws and regulations."

121. The Interagency Guidance specifically notes that "applicable laws and regulations throughout this guidance include but are not limited to those designed to protect consumers (such as fair lending laws and prohibitions against unfair, deceptive or abusive acts or practices) and those addressing financial crimes."

122. The Interagency Guidance further provides that "a banking organization's use of third parties does not diminish its responsibility to meet these requirements to the same extent as if its activities were performed by the banking organization in-house." *Id.*, at 1-2.

123. Under the Interagency Guidance and applicable laws and regulation, TD Bank has an ongoing obligation to ensure that ARC performed its activities in compliance with applicable laws and regulations, including the RFPA, as if those activities had been performed by TD Bank in-house.

124. To operate in a safe and sound manner, a banking organization is required to implement "risk management practices to effectively manage the risks arising from its activities, including from third-party relationships"; thus, TD Bank had (and has) an obligation to manage the risks from activities that flowed through its relationship with ARC. *Id.*

125. The Interagency Guidance addresses "any business arrangement between a banking organization and another entity, by contract or otherwise," with the term "business arrangement" meant to be interpreted broadly and synonymously with "third-party relationship," which encompasses TD Bank's relationship with ARC. *Id.* at 2.

126. The Guidance warns that "a banking organization can be exposed to adverse impacts, including substantial financial loss and operational disruption, if it fails to appropriately manage the risks associated with third-party relationships. Therefore, it is important for a banking organization to identify, assess, monitor, and control risks related to third-party relationships." *Id*.

127. TD Bank has (and had) a legal obligation to identify, assess, monitor, and control risks related to its relationship with ARC and ARC's activities.

128. The stages of the risk management life cycle in this context include initial and ongoing due diligence obligations, documentation, reporting, oversight and accountability, and independent reviews of the third-party provider. *Id*. at 4.

129. Included among the factors a banking organization should consider in onboarding and managing a third-party provider is an "assess[men]t of a potential third party's impact on customers, including access to or use of those customers' information, third-party interaction with customers, potential for consumer harm, and handling of customer complaints and inquiries." *Id.*

130. This guidance makes clear that applicable law and regulation impose upon TD Bank the duty to assess ARC's impact on customers, which included their use of customer information.

131. TD Bank cannot avoid responsibility for ARC's compliance with the RFPA or other applicable law under the Interagency Guidance, which provides that "a banking organization is responsible for conducting its activities in compliance with applicable laws and regulations, including those activities involving third parties. ***The use of third parties does not abrogate these responsibilities***." *Id*. at 13 (emphasis added).

132. This is particularly so given that, with respect to contracts with third parties, "effective contracts typically prohibit the use and disclosure of banking organization and customer

23

information by a third party and its subcontractors, except as necessary to provide the contracted activities or comply with legal requirements. If the third party receives personally identifiable information, contract provisions are important to ensure that the third party implements and maintains appropriate security measures to comply with applicable laws and regulations." *Id*. at 14.

133.    In this respect, TD Bank had a duty to: (1) Conduct initial due diligence, (2) ensure ARC, who was operating by and through TD Bank's bank charter, was complying with the RFPA, (3) contract with ARC to ensure that ARC was complying with the RFPA, and (4) audit and conduct ongoing due diligence to ensure that ARC was in compliance with the RFPA.

134.    TD Bank failed in its duties to either: (1) Conduct adequate initial and ongoing due diligence, which would have revealed that ARC was selling customer financial data to the government, (2) ensure ARC, who was operating under TD Bank's bank charter, was complying with the RFPA, (3) to contract with ARC to demand compliance with the RFPA, and (4) audit and conduct due diligence to ensure ARC's compliance with the RFPA.

135.    The July 2024 Joint Statement on Banks' Arrangements with Third Parties to Deliver Bank Deposit Products and Services (the "Joint Statement") provides additional guidance and makes TD Bank's responsibilities abundantly clear.

136.    Under the Joint Statement, TD Bank's regulators provided guidance under applicable law and regulation to ensure banks understood that its obligations with respect to third parties included "non-bank companies, such as, but not limited to, certain financial technology (or fintech) companies," and that an "end user" includes "consumers and businesses accessing deposit products and services through the arrangements described in this statement." *Id.*, at 1 n.1-2.

24

137. The described arrangements include instances where banks "rely on one or multiple third parties to maintain the deposit and transaction system of record; process payments (sometimes with the ability to directly submit payment instructions to payment networks); perform regulatory compliance function; provide end-user facing technology applications; service accounts; perform customer service; and perform complaint and dispute resolution functions." *Id.*, at 1.

138. These third parties are "sometimes referred to as intermediate platform providers, processors, middleware providers, aggregation layers and/or program managers." *Id.*

139. The Joint Statement emphasizes that "a bank's use of third parties to perform certain activities does not diminish its responsibility to comply with all applicable laws and regulations." *Id.*

140. Without adequate initial due diligence and ongoing monitoring, "risks to the integrity of a bank's deposit function are heightened," with the statement noting in a footnote that "integration may amplify operational risks, such as fraud, cybersecurity, and data privacy incidents occurring at the third party that then affect the bank." *Id.*, at 2, n.4.

141. Banks are expected to "operate in a safe and sound manner and in compliance with applicable laws and regulations, including those related to safety and soundness, consumer protection, and anti-money laundering/countering the financing of terrorism (AML/CFT). Effective board and senior management oversight is crucial to ensure a bank's risk management practices are commensurate with the complexity, risk, size, and nature of the activity and relationship, both when the relationship commences and as it evolves over time." *Id.*, at 4-5.

142. TD Bank's responsibility for ARC's compliance with the RFPA and other applicable law is particularly clear given the nature of the payment settlement system. TD Bank

owns and controls the underlying banking infrastructure. The financial records at issue—records of customer payment transactions—are generated by and maintained within a system operated on behalf of TD Bank.

143. Customers whose financial records are maintained in this system are entitled to the RFPA's protections, and TD Bank cannot disclaim responsibility for violations simply because it has delegated certain aspects of the day-to-day operation of the system to an agent.

144. Just as a bank cannot avoid liability for privacy violations by outsourcing its data processing to a third-party vendor, TD Bank cannot evade RFPA liability by operating its airline payment settlement system through ARC.

145. Moreover, TD Bank had or should have had actual knowledge of ARC's arrangements with federal agencies for disclosure of customer financial records.

146. As the principal in the agency relationship and as the regulated financial institution with ultimate responsibility for RFPA compliance, TD Bank had a duty to ensure that ARC's operations complied with federal and state privacy laws. Pursuant to the Interagency Guidance, TD Bank is required to conduct due diligence on ARC's compliance with applicable laws and regulations, including consumer protection and privacy laws.

147. TD Bank was (and is) required to assess ARC's "impact on customers, including access to or use of those customers' information," and to ensure that ARC's contracts and operations include provisions prohibiting "the use and disclosure of banking organization and customer information by a third party and its subcontractors, except as necessary to provide the contracted activities or comply with legal requirements."

148.    The bank's hand-in-hand cooperation with ARC in violating the RFPA and its failure to prevent, halt, or remedy ARC's systematic violations of the RFPA render TD Bank liable for those violations under principles of agency law and under the RFPA's own liability provisions.

**E.    Alternatively, ARC is not Merely an Agent, But Is Also a Financial Institution in Its Own Right**

149.    Alternatively, ARC is not merely an agent but is a financial institution in its own right.

150.    ARC qualifies as a "financial institution" within the meaning of the RFPA through multiple independent bases. ARC operates at the intersection of several financial services categories and falls within the statutory definition of "financial institution" under 12 U.S.C. § 3401(1) as a consumer finance institution, payment processor, and entity engaged in financial activities.

151.    ARC provides a settlement and payment processing platform that supports airlines and travel agencies. Settlement and payment processing are bank functions, meaning only a bank can conduct settlement and payment processing because it requires a bank charter, which ARC essentially borrowed from TD Bank to conduct the activities at issue in this Complaint.

152.    From a classification perspective, ARC also operates at the intersection of several financial services categories that bring it within the RFPA's definition of "financial institution":

153.    Among the financial solutions offered by ARC are the following core functions that demonstrate its role as a financial institution including, but not limited to (a) sending transactions and payments to airlines' bank accounts, processing money transfers, and performing traditional banking functions.

154.    Alternatively, ARC is a consumer finance institution under the RFPA.

27

**F.    ARC as Agent of TD Bank and TD Bank's Vicarious Liability**

155.    By its terms, the RFPA applies to both a financial institution and its agents, making TD Bank directly liable for violations of the RFPA at issue in this Complaint, and/or TD Bank is also vicariously liable for the RFPA and other violations under traditional agency law.

156.    Beyond ARC's independent status as a financial institution, ARC acts together with and/or as agent for TD Bank, and TD Bank is liable in its own right and/or is vicariously liable for ARC's conduct.  TD Bank owes a duty to oversee its third-party providers, institution-affiliated parties, and bank service providers and is ultimately responsible for ARC's conduct in carrying out transactions enabled through TD Bank's charter.

157.    Without TD Bank, ARC's business model entirely fails. And importantly, without TD Bank, ARC would not have the ability to access Plaintiffs' and Class Members' detailed personal and financial information and travel records. Upon information and belief, TD Bank and ARC entered into a contract that allows ARC to utilize the authority granted to TD Bank through its charter and BIN/ICA number, and that provides TD Bank with the right to control ARC's conduct.  Aside from and in addition to any such agreement, there is significant indicia of TD Bank's control over ARC.

**G.    Violations of RFPA's Core Requirements**

158.    The arrangement between Defendants and federal agencies violates the RFPA's core requirements in multiple respects.

159.    *First*, the disclosures lack proper legal process. The RFPA requires that government agencies obtain customer financial records through one of several specified mechanisms: administrative subpoena or summons meeting statutory requirements, search warrant, judicial subpoena, or formal written request with customer authorization. 12 U.S.C. § 3402.

160. None of these mechanisms were employed here. Instead, ARC provided bulk database access through commercial contracts, allowing federal agencies to search financial records at will without any individualized legal process for each customer whose records are accessed.

161. *Second*, the disclosures lacked the requisite customer notice. Under 12 U.S.C. § 3404, when a government authority seeks financial records, the individual whose records are sought must receive notice and has the right to challenge the request in court before the records are disclosed. The government must serve or mail a copy of its request to the individual on or before the date it serves the order or delivers the request to the financial institution. The individual then has 10 to 14 days to challenge the disclosure.

162. None of these notice requirements were satisfied.

163. Plaintiffs and Class Members received no notice that their financial records were being sold to or accessed by federal agencies.

164. Plaintiffs and Class Members had no opportunity to challenge the disclosure or to assert their rights before their private financial information was turned over to the government.

165. *Third*, the disclosures lack required certification.

166. The RFPA provides that "[a] financial institution shall not release the financial records of a customer until the Government authority seeking such records certifies in writing to the financial institution that it has complied with the applicable provisions of this chapter." 12 U.S.C. § 3403(b).

167. No such certification was obtained or could have been obtained, as the government agencies did not comply with the RFPA's requirements.

168. During the relevant period, Plaintiffs and Class Members were persons who utilized or were utilizing "any service" of a financial institution, and thus were customers under the statute.

169. Plaintiffs' and Class Members' personal information and payments flowed through TD Bank and ARC.

170. Defendants sold this information and released personal financial records without any written certification of RFPA compliance.

171. *Fourth*, the bulk nature of the access violates the RFPA's individualized process requirements.

172. The RFPA contemplates that government agencies will seek specific records of specific customers through appropriate legal process.

173. The statute does not authorize—and Congress specifically rejected—bulk access arrangements that allow government agencies to search databases of customer financial records at will.

174. The TIP system provides exactly this type of prohibited bulk access, allowing federal analysts to conduct unrestricted searches by name or credit card number across billions of records without any individualized suspicion or legal process for each search.

175. *Fifth*, no exception to the RFPA's requirements applies.

176. The RFPA contains limited exceptions permitting disclosure without notice in certain narrow circumstances, such as examination by banking regulators, grand jury subpoenas, and certain intelligence activities. 12 U.S.C. § 3413.

177. None of these exceptions apply to the bulk data-sharing arrangement at issue here.

178. The "disclosures" (i.e., sales) were not made pursuant to regulatory examinations of TD Bank or ARC.

179.    The disclosures (i.e., sales) were not made in response to grand jury subpoenas.

180.    The disclosures (i.e., sales) were not limited to authorized foreign intelligence activities.

181.    Rather, the "disclosures" (i.e., sales) were made pursuant to commercial contracts to provide ongoing bulk access to customer financial records for general law enforcement, immigration enforcement, and intelligence purposes—exactly the type of surveillance that Congress intended to prohibit through the RFPA.

H.    **TD Bank's Knowledge and Responsibility**

182.    TD Bank had actual knowledge or should have known of ARC's arrangements with federal agencies and law enforcement, as well as others, for disclosure of customer financial records.

183.    Although the public was not made aware of the extent of data provided to the government until the recent public release of the ICE Proposal, TIP has been publicly known and/or TD Bank was in a unique position and had the obligation to inquire about this program and the use and sharing of customer financial data.

184.    Government procurement records documenting contracts between ARC and federal agencies have been publicly available on USAspending.gov and SAM.gov for years.

185.    TD Bank was legally obligated to inquire about these contracts and to ensure ARC, as its agent and while acting under its charter, was complying with the RFPA as though TD Bank were performing the actions themselves.

186.    As the principal in the agency relationship and as the regulated financial institution with ultimate responsibility for due diligence in the ARC relationship and ARC's compliance with the RFPA and other applicable laws, TD Bank had (and has) a duty to conduct due diligence on ARC's operations and ensure compliance with federal and state consumer protection and privacy

31

laws because it is responsible for ARC's activities as if TD Bank was performing the activity itself, and TD Bank maintained the ability to control ARC and its compliance with data privacy and consumer protection regulations.

187.    With respect to TD Bank's contract with ARC, TD Bank had a responsibility and the ability and control to include a contractual provision prohibiting the use and disclosure of banking organization and customer information by a third party and its subcontractors.

188.    TD Bank failed to meet these obligations. Despite its duty to ensure ARC's compliance with applicable laws and regulations, and its ability to control aspects of that relationship and ARC's conduct, TD Bank by and through ARC systematically and repeatedly violated the RFPA by providing bulk access to customer financial records to federal agencies without proper legal process or customer notice.

189.    TD Bank either failed to include contractual provisions prohibiting ARC from reselling or providing access to customer data except as necessary to provide settlement services, or alternatively TD Bank failed to conduct the requisite ongoing due diligence and audits to ensure that those contractual provisions were being adhered to.

190.    TD Bank failed to monitor ARC's use of customer data and failed to prevent ARC's violations of federal and state privacy and consumer protection laws.

191.    The bank's failure to prevent, halt, or remedy ARC's systematic violations of the RFPA renders TD Bank liable for those violations under principles of agency law, under federal banking regulations holding banks responsible for the conduct of their third-party service providers, under the RFPA's own liability provisions and because the acts were performed by and through the use of TD Bank's charter.

192.    In February 2025, the Office of the Comptroller of the Currency issued OCC Bulletin 2025-23, "Protecting Customer Financial Records," which specifically reminded banks of their obligations under the RFPA.

193.    The bulletin reminded banks that under the RFPA, 12 USC §§ 3401-3423, financial institutions are prohibited from providing any government authority access to a customer's financial records except in limited circumstances.

194.    The OCC further reminded TD Bank of its legal obligations to protect its customers' financial information, even if that information is requested by government agencies.

195.    The bulletin was issued in response to a House Judiciary Committee report concluding that financial institutions had coordinated with federal law enforcement to surveil and share private financial information of persons engaged in transactions commonly associated with certain political affiliations.

196.    The OCC bulletin and Executive Order 14331 emphasize that banks must protect customer financial records.

197.    This recent guidance underscores what TD Bank should have already known about its obligations to protect customer financial records from improper government access.

198.    TD Bank's enabling of ARC by allowing it to act under the power of its bank charter and TD Bank's failure to prevent ARC from providing bulk access to customer financial records without proper legal process or notice, or from selling its data to commercial third parties, violates both the RFPA and TD Bank's fundamental obligations as a regulated financial institution.

### I.    Willful and Intentional Violations

199.    Defendants' violations of the RFPA and other federal and state laws were willful and intentional, warranting punitive damages under 12 U.S.C. § 3417(c) and other applicable law. The systematic nature of the violations, the contractual arrangements specifically designed to

provide government access without RFPA compliance, and ARC's explicit request that government agencies conceal ARC's identity as the data source all demonstrate intentional disregard for federal privacy law.

200.     ARC developed TIP specifically to sell customer financial information to government agencies and others.

201.     The TIP program was not an inadvertent disclosure or an isolated mistake.

202.     TIP was a deliberate business line designed to generate revenue by providing government agencies and others with access to individual personal and financial records that the government agencies could not lawfully obtain through other means.

203.     ARC's request that ICE not publicly identify the vendor, or its employees, individually or collectively, as the source of the Reports unless the Customer is compelled to do so by a valid court order or subpoena demonstrates consciousness of wrongdoing.

204.     If ARC believed its data-sharing arrangements were lawful and appropriate, there would be no reason to demand secrecy. The contractual secrecy provision reveals that ARC knew its arrangements would not withstand public scrutiny or legal challenge.

205.     Similarly, TD Bank is responsible for the actions of its third-party providers to the same degree as though the actions were performed by the bank itself.

206.     Further, TD Bank's failure to prevent or halt these violations despite its knowledge of ARC's data-sharing arrangements demonstrates willful disregard for the RFPA. As the regulated financial institution with ultimate responsibility for ensuring RFPA compliance, TD Bank had a duty to prevent ARC from systematically violating federal privacy law. TD Bank's failure to fulfill this duty, despite clear regulatory guidance requiring banks to ensure third-party providers comply with applicable laws, constitutes willful and intentional violation of the RFPA.

**J.      ARC Converted Property and Was Unjustly Enriched Through the Sale of Plaintiffs' and Class Members' Personal and Financial Data**

207.    By capturing and selling Plaintiffs' and Class Members' property without authorization to government agencies and others, ARC committed the common-law tort of conversion and unjustly enriched itself at the expense of the true owners of that valuable property.

208.    ARC operated as a "silent" or undisclosed payment intermediary in online (or point-of-sale) transactions. Consumers, including Plaintiffs and Class Members, believed they were paying the merchant directly, but instead ARC captured and retained consumers' full names, addresses, travel and physical location details, complete credit card data, and more, and then used that information for its own profit and commercial exploitation.

209.    ARC's impermissible retention, appropriation, conversion and sale of consumer information to third parties and government agencies was done without the knowledge or consent of Plaintiffs and Class Members.

210.    In retaining the consumer data and selling access for a profit to not only the government but also other third parties, ARC went well beyond the scope of its role—which was merely to process a consumer's payment—and Plaintiffs and Class Members were required to surrender more information and property in the transaction than they would have otherwise.

211.    Until the recent media reports disclosing the sale of their information, Plaintiffs and Class Members never knew of ARC's existence, never consented to providing their data to ARC, and never authorized ARC to sell or otherwise commercialize that data. (Merchants likewise never disclosed to Plaintiffs or Class Members ARC's role or data practices.)

35

212.    ARC nevertheless treated the captured PII, location history, and payment-card data as its own commodity, selling it to government agencies and third parties.[2]

213.    As evidenced by the millions of dollars in revenue ARC received for the sale of this data, Plaintiffs' and Class Members' personal, travel, financial consumer and pre-sale behavioral information undeniably have objectively ascertainable value.

214.    The financial data of this type, alone, has objectively ascertainable fair-market value.

215.    In ARC's retaining, using and selling full access to Plaintiffs' and Class Members' personal and financial data, Plaintiffs and Class Members were deprived of the right to exclude government agencies and other third-parties from their private property.

216.    ARC's appropriation, conversion and exercise of dominion was inconsistent with, and in outright denial of, Plaintiffs' and Class Members' rights of ownership and exclusive possession, causing damage and injury-in-fact.

217.    Plaintiffs and Class Members did not consent to ARC's retention or sale of their property.

218.    As a direct and proximate result, Plaintiffs and each Class Member have been damaged in an amount equal to the fair-market value of the converted property.

219.    ARC's conversion was willful, wanton, and in reckless disregard of Plaintiffs' and Class Members' rights, warranting punitive damages.

220.    ARC also received a measurable economic benefit (proceeds from the sale of the data) at the direct expense of Plaintiffs and the Class.

---

[2] ARC also sells access to the ARC COMPASS database to airlines, travel agencies, corporate travel departments, railroads and/or other approved parties.

221. It would be inequitable and unconscionable for ARC to retain that benefit.

222. Plaintiffs and the Class are entitled to restitution/disgorgement in the amount ARC realized from the sale of their property.

## V. CLASS ACTION ALLEGATIONS

223. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3).

224. The proposed class is defined as: All natural persons who are residents of the United States whose financial records relating to airline ticket purchases made through travel agencies or online travel booking platforms were processed through Airlines Reporting Corporation's and TD Bank's settlement system and disclosed to federal government agencies through ARC's TIP without proper legal process or notice during the period from January 1, 2021 to April 21, 2026 (the "Class Period").

225. Excluded from the Classes are: (1) Defendants and their officers, directors, and employees; (2) governmental entities; (3) the Court and its staff; and (4) any judge presiding over this action and members of their immediate families.

226. Numerosity: The Classes are so numerous that joinder of all members is impracticable. Upon information and belief, each of the Classes includes millions of individuals whose airline ticket purchases were processed through ARC's and TD Bank's settlement system and whose financial records were disclosed to federal agencies through the TIP. ARC's database contains over one billion records spanning 39 months of travel data. The precise number of Class Members is unknown to Plaintiffs but may be determined from Defendants' records.

227. Commonality: There are questions of law and fact common to the Classes, including:

(a)    Whether Defendants are "financial institutions" within the meaning of the RFPA;

(b)    Whether the records disclosed by Defendants constitute "financial records" within the meaning of the RFPA;

(c)    Whether Defendants disclosed Class Members' financial records to federal government agencies;

(d)    Whether these disclosures were made without proper legal process as required by the RFPA;

(e)    Whether these disclosures were made without providing required notice to Class Members;

(f)    Whether these disclosures were made without obtaining required certifications from government agencies;

(g)    Whether any exception to the RFPA's requirements applies to these disclosures;

(h)    Whether Defendants' violations of the RFPA were willful and intentional;

(i)    Whether ARC acts as agent of TD Bank for purposes of the RFPA;

(j)    Whether Plaintiffs and Class Members' property was unlawfully converted;

(k)    Whether Defendant(s) were unjustly enriched;

(l)    Whether TD Bank is vicariously liable for ARC's RFPA violations;

(m)    Whether Class Members are entitled to statutory damages under the RFPA;

38

(n)    Whether Class Members are entitled to punitive damages under the RFPA; and

(o)    Whether Class Members are entitled to attorney's fees and costs under the RFPA.

228.    Typicality: Plaintiffs' claims are typical of the claims of the Class. Plaintiffs, like all Class Members, purchased airline tickets through travel agencies or online booking platforms, had their transactions processed through ARC's settlement system, and had their financial records disclosed to federal agencies and others through ARC's TIP without proper legal process, notice or consent. Plaintiffs' claims arise from the same course of conduct by Defendants and are based on the same legal theories as the claims of all Class Members.

229.    Adequacy: Plaintiffs will fairly and adequately protect the interests of the Class. Plaintiffs have no interests antagonistic to or in conflict with the Class. Plaintiffs have retained counsel experienced in class action litigation and privacy and banking law and regulation who are qualified to prosecute this action on behalf of the Class.

230.    Predominance and Superiority (Rule 23(b)(3)): Questions of law and fact common to the Class predominate over any questions affecting only individual members. Defendants' systematic violations of the RFPA through the TIP affect all Class Members in the same manner. Defendants' appropriation, conversion and unjust enrichment affect all Class Members in the same manner. The common questions identified above predominate over any individual questions.

231.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. The damages suffered by individual Class Members may be relatively small compared to the burden and expense of individual litigation, making it impracticable for Class Members to seek redress individually. Concentration of this litigation in a

single forum will promote judicial efficiency and provide consistent results for similarly situated individuals. The Class is readily identifiable from Defendants' records. Plaintiffs are unaware of any difficulties likely to be encountered in the management of this action that would preclude its maintenance as a class action.

232. Injunctive Relief (Rule 23(b)(2)): Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate final injunctive relief with respect to the Class as a whole. Defendants continue to provide federal agencies and others with access to Class Members' personal, travel and financial records through the TIP in violation of the RFPA and the common law. Injunctive relief prohibiting these ongoing violations is appropriate.

**COUNT I – VIOLATION OF THE
RIGHT TO FINANCIAL PRIVACY ACT**
(*Against TD Bank on behalf of Plaintiffs and the RFPA Class*)

233. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if fully stated herein.

234. TD Bank is a "financial institution" within the meaning of 12 U.S.C. § 3401(1).

235. Plaintiffs and Class Members utilized or were utilizing "any service of a financial institution," and are thus "customers" within the meaning of 12 U.S.C. § 3401(5).

236. The records disclosed by TD Bank, through its agent ARC, to federal government agencies constitute "financial records" within the meaning of 12 U.S.C. § 3401(2) because the information was an actual record or was derived from an actual record, including payment card information, transaction amounts, dates of purchase, travel itineraries, and credit card numbers.

237. TD Bank disclosed, or caused to be disclosed, Plaintiffs' financial records to federal government agencies including ICE, and numerous other agencies through ARC's TIP.

238. These disclosures were made without proper legal process as required by 12 U.S.C. § 3402.

239. These disclosures were made without providing required notice to Plaintiffs as required by 12 U.S.C. § 3404.

240. These disclosures were made without obtaining written certification from the government agencies that they had complied with the applicable provisions of the RFPA, in violation of 12 U.S.C. § 3403(b).

241. No exception to the RFPA's requirements applies to these disclosures.

242. TD Bank's conduct violates 12 U.S.C. §§ 3402, 3403, 3404, and 3405.

243. As a direct and proximate result of TD Bank's violations, Plaintiffs have suffered injuries including loss of privacy in their financial information, inability to challenge government access to their records, exposure to government surveillance without individualized suspicion, and loss of statutory rights.

244. TD Bank's violations were willful and intentional, warranting punitive damages under 12 U.S.C. § 3417(c).

245. Plaintiffs are entitled to statutory damages of $100 per violation under 12 U.S.C. § 3417(a)(1)(A), actual damages under 12 U.S.C. § 3417(a)(1)(B), punitive damages under 12 U.S.C. § 3417(c), and reasonable attorney's fees and costs under 12 U.S.C. § 3417(a)(2).

**COUNT II - VIOLATION OF THE**
**RIGHT TO FINANCIAL PRIVACY ACT**
**(*Against ARC on behalf of Plaintiffs and the RFPA Class*)**

246. Plaintiffs reallege and incorporate by reference the preceding paragraphs as if set forth here in full.

247. ARC is a "financial institution" within the meaning of 12 U.S.C. § 3401(1) by virtue of its role as a consumer finance institution, payment processor, card issuer agent, bank service provider, institution-affiliated party, third-party service provider, and entity engaged in financial activities.

41

248.    Alternatively, ARC acted as agent of TD Bank, a financial institution, in maintaining and disclosing customer financial records, and ARC's violations of the RFPA are in direct violation of the RFPA's express prohibition applicable to "agents of financial institutions" and are also attributable to TD Bank under banking regulations and principles of agency law.

249.    Plaintiffs and Class Members are "customers" within the meaning of 12 U.S.C. § 3401(5) because they are persons who utilized or were utilizing "any service" of a financial institution.

250.    The records disclosed by ARC to federal government agencies constitute "financial records" within the meaning of 12 U.S.C. § 3401(2), including payment card information, transaction amounts, dates of purchase, travel itineraries, passenger names, and credit card numbers.

251.    ARC disclosed Plaintiffs' and Class Members' financial records to federal government agencies including ICE, and numerous other agencies through its TIP.

252.    These disclosures were made without proper legal process as required by 12 U.S.C. § 3402.

253.    These disclosures were made without providing required notice to Plaintiffs as required by 12 U.S.C. § 3404.

254.    These disclosures were made without obtaining written certification from the government agencies that they had complied with the applicable provisions of the RFPA, in violation of 12 U.S.C. § 3403(b).

255.    No exception to the RFPA's requirements applies to these disclosures.

256.    ARC's conduct violates 12 U.S.C. §§ 3402, 3403, 3404, and 3405.

257.    As a direct and proximate result of ARC's violations, Plaintiffs have suffered injuries including loss of privacy in their financial information, inability to challenge government access to their records, exposure to government surveillance without individualized suspicion, and loss of statutory rights.

258.    ARC's violations were willful and intentional, warranting punitive damages under 12 U.S.C. § 3417(c), as evidenced by ARC's establishment of the TIP specifically to sell customer financial records to government agencies and ARC's contractual demand that government agencies conceal ARC as the source of the data.

259.    Plaintiffs are entitled to statutory damages of $100 per violation under 12 U.S.C. § 3417(a)(1)(A), actual damages under 12 U.S.C. § 3417(a)(1)(B), punitive damages under 12 U.S.C. § 3417(c), and reasonable attorney's fees and costs under 12 U.S.C. § 3417(a)(2).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly situated, respectfully request that this Court:

A.    Certify this action as a class action pursuant to Federal Rule of Civil Procedure 23, appoint Plaintiffs as Class Representatives, and appoint Plaintiffs' counsel as Class Counsel;

B.    Enter judgment in favor of Plaintiffs and the Class and against Defendants on all counts;

C.    Award Plaintiffs and each Class Member statutory damages of $100 per violation pursuant to 12 U.S.C. § 3417(a)(1)(A);

D.    Award Plaintiffs and each Class Member actual damages pursuant to 12 U.S.C. § 3417(a)(1)(B);

E.    Award Plaintiffs and the Class punitive damages pursuant to 12 U.S.C. § 3417(c) for Defendants' willful and intentional violations of the RFPA;

43

F.	Enter permanent injunctive relief prohibiting Defendants from disclosing Class Members' financial records to government agencies without complying with the requirements of the RFPA, including proper legal process and customer notice;

G.	Award Plaintiffs and the Class reasonable attorney's fees and costs pursuant to 12 U.S.C. § 3417(a)(2);

H.	Award pre-judgment and post-judgment interest as allowed by law; and

I.	Grant such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs, individually and on behalf of all other Class Members, request a trial by jury on all claims so triable.

Dated: April 21, 2026	**LABATON KELLER SUCHAROW LLP**

By:	*/s/ Mark D. Richardson*
Mark D. Richardson (Bar No. 6575)
222 Delaware Avenue, Suite 1510
Wilmington, Delaware 19801
Telephone:	302.573.2540
Email:	mrichardson@labaton.com

Jonathan D. Waisnor (*pro hac vice* forthcoming)
James M. Fee (*pro hac vice* forthcoming)
140 Broadway
New York, New York 10005
Telephone:	212.907.0700/302.573.2529
Email:	jwaisnor@labaton.com
	jfee@labaton.com

**LEVIN LAW, P.A.**

Brian Levin (*pro hac vice* forthcoming)
2665 South Bayshore Drive, PH2
Miami, FL 33133
Telephone: (305) 402-9050
Email: brian@levinlawpa.com

*Counsel for Plaintiffs and the Proposed Class*

45